[Civ. No. 5047.   Fourth Dist.   Jan. 26, 1955.]

MONS M. NICHOLL et al., Respondents, v.
ADELE IPSEN, Appellant.

Otto K. Paulus for Appellant.

John W. Solomon for Respondents.

GRIFFIN, J.— Plaintiffs, as payees, brought this action upon five separate promissory notes signed by defendants Adele Ipsen and Erik S. Reinert. No service was had upon

Reinert. Judgment was entered only against defendant Ipsen for $5,893.66, plus attorneys' fees and interest.

Prior to July 15, 1949, defendants Ipsen and Reinert had acquired the United States rights (denominated Buen patents) in certain Norwegian patents covering a mechanical invention pertaining to a certain method of constructing houses from logs and other materials by means of interlocking ends. On July 15, 1949, defendants signed a memorandum of agreement with plaintiff Johnson, a general contractor, and Anne Nicholl (wife of plaintiff Mons M. Nicholl, who was substituted for her in a supplemental agreement dated August 2, 1949). The original memorandum recites that "for the purpose of reducing to writing the understanding of the various parties to this memorandum, the following terms and conditions are tentatively agreed upon"; that Reinert and Ipsen have in their joint names a certain contract with the Buen Houses, Limited, of Norway, granting to them the right to manufacture and sell products manufactured by the machine covered by the Norwegian and American patent rights; that in acquiring said patent rights, and, in addition, a machine designed in accordance with the patents, Reinert, Ipsen and A. E. Olss have entered into a tentative oral partnership agreement based on the investment of the new parties, Johnson and Nicholl, by the terms of which Reinert has a 25 per cent interest, Ipsen 25 per cent, and Olss 30 per cent. It then provides that Johnson and Nicholl propose investing in the partnership and business, including all the assets thereof, the sum of $3,000 each, for which they are each to receive a 10 per cent interest in said partnership business, and assets above mentioned. The investment of the $6,000 by plaintiffs is conditioned upon satisfactory examination of the patent rights agreement, the machine, and its production ability, to be determined by plaintiffs within 16 days of the date of the memorandum. It then provided if plaintiffs decided to make the investment the partnership business was to be immediately incorporated, and there was to be issued to plaintiffs, corporation stock in an amount equal to 20 per cent of $30,000, the proposed authorized capitalization. It was then agreed that Olss was not in the United States at the time and accordingly final details of the business agreement between the parties were to be subject to his consent and approval. This agreement was signed by all parties except Olss. On August 2d, 1949, a supplemental memorandum was signed by the same parties.

It referred to the original written agreement and provided that plaintiffs acknowledge their willingness to advance the $6,000 under certain conditions, including: (1) That such advancement was to be made at such time as the business is incorporated and shares of stock of the value of $6,000 are issued to them in accordance with the provisions of the agreement. (2) That pending the incorporation plaintiffs would advance portions of the $6,000 by way of loan to Ipsen and Reinert to be represented by promissory notes payable in six months. (3) That when the business is completed and stock available to plaintiffs, as indicated, the promissory notes were to be cancelled and credited against the investment by Johnson and Nicholl. (4) That plaintiffs would pay their own attorney to investigate the validity and availability of the claimed patent rights and in case they were not, in the opinion of the attorney, acceptable for any reason prior to the incorporation of the business, the obligation of plaintiffs to invest $6,000 in the business is to be canceled and the promissory notes here involved are to be payable when due. (5) A provision is then made that since Olss was out of the United States it was mutually understood between those who signed the agreements that the terms and conditions thereof were subject to his consent and approval.

It appears that immediately upon the signing of the first memoranda by the parties indicated, plaintiffs commenced spending money in behalf of the enterprise, made plans for, and took general charge of the operation of the business. It was provided in the agreement that after plaintiffs invested their funds they must approve all expenditures of any funds by the partnership until the corporation was formed. The general method of payment of bills was for plaintiffs to contract the obligations and then make checks payable to Mrs. Ipsen or Reinert, who would endorse them and pay the bills and after an accumulated amount was shown, Ipsen and Reinert executed the series of notes indicated, payable to plaintiffs. It was stipulated that all sums advanced went into the business. Some money was paid to Reinert for personal living expenses, etc. while he was in Oregon endeavoring to set up the machinery for its operation. No corporation was ever formed, and accordingly no stock was issued. The agreements in question were never signed by Olss.

From the evidence, the reason the agreements were never carried out by the respective parties is problematical and un-

certain. Olss claimed his refusal to participate was because Reinert always insisted on having a 51 per cent interest in the business without any investment. He testified that he (Olss) never did own a 30 per cent interest in it and that he never had any interest in the so-called Buen patent rights.

It is the testimony of Johnson that in reference to the patent on the ''log house proposition'' he never received any information from the patent attorneys indicating that the Buen organization had more than one patent; that they did have an application pertaining to a type of machinery but that it had no relation to the business of building houses.

There is a letter in evidence dated August 25, 1949, from those attorneys reciting that application for patent serial number 792,291 was one of the patent rights assigned to defendants, but it was not a *Buen* application and that accordingly some error existed in this respect.

There is in evidence a letter dated October 12, 1949, indicating that plaintiffs had had no news in reference to the validity of the patent rights as of that date.

Defendants offered in evidence a certificate of the Commissioner of Patents dated December 21, 1951, certifying that there had been no assignment of letters patent granted Buen interests ''Patent No. 2,558,036, dated June 26, 1951. Templet-Guided Cutter for Shaping Log Ends'' since December 17, 1945.

The answer of Ipsen, by way of defense to the causes of action, is that under the two memorandum agreements above mentioned, the notes here in question were and are securities under Deering's General Laws, Act 3814, section 2, subdivision 7; that under section 33 of said act and Corporations Code, sections 25153 and 26100, the notes are null and void. It is there also claimed that under an oral agreement and by virtue of the provisions of the memorandum agreements, defendants were to assume no liability for the payment of the notes unless plaintiffs sustained a loss by reason of the Buen patents infringing on other United States patents, and since no loss occurred thereby no liability for payment of the notes accrued; that the written agreements, accompanying the notes, must be considered a part of the conditions of payment of the notes, and since those agreements were never fully executed, due to lack of the signature of Olss, the entire transaction, including the signed notes, must be considered as of no force and effect.

After trial, the court found generally for plaintiffs and specifically found that the notes were duly executed and that the memoranda agreements were executed by and delivered to the respective signatory parties; that the memoranda agreements were drawn by the attorney for Olss; that neither memorandum agreement was approved or accepted by Olss, and by their terms they were not effective unless so approved, but that the parties to these memoranda agreements, by their conduct, have given effect to them and, to the extent they have been executed, they were valid and binding on the parties; that the sums of money advanced by plaintiffs to defendants were loans by the plaintiffs to the defendants individually; that these notes were never offered to the public for sale and that none of the transactions involving the promissory notes were in violation of the Corporate Securities Act; that the principal sums of said notes, together with interest, were wholly unpaid. It then found that the allegations of defendant's answer were untrue except as to those allegations which were specifically found to be true.

Judgment was rendered accordingly and defendant Ipsen appealed.

The first argument is that notes given for money paid on an illegal stock subscription are invalid, void, and not collectible where the parties are *in pari delicto,* or where no permit is secured for their sale, citing the authorities referred to in her answer and *Tevis* v. *Blanchard,* 122 Cal. App.2d 731 [266 P.2d 85]; *Imperial Livestock etc. Co.* v. *Tracy,* 208 Cal. 205 [281 P. 50]; *Menke* v. *Rand Mining Co.,* 81 Cal.App.2d 169 [183 P.2d 755]; and *Miller* v. *California Roofing Co.,* 55 Cal.App.2d 136 [130 P.2d 740]. It is further contended that the notes were not exempted under Deering's General Laws, Act 3814, section 2(b), subdivisions 10 and 11, effective as of the date of this transaction, citing *People* v. *Oliver,* 102 Cal.App. 29, 36 [282 P. 813]; *People* v. *Davenport,* 13 Cal.2d 681 [91 P.2d 892]; *People* v. *Sidwell,* 27 Cal. 2d 121, 128 [162 P.2d 913]; and *Cecil B. De Mille Productions* v. *Woolery,* 61 F.2d 45.

The general holding of the authorities relied upon by defendant establishes that a promissory note given by a stranger to a corporation, or to an incorporator, in payment of stock, without, or in violation of, a permit to issue such stock is uncollectible by the corporation or by the incorporator. *Miller* v. *California Roofing Co., supra,* involved an action by the manager of a corporation against the corporation for money

paid for stock of the corporation. Judgment for defendant corporation was sustained principally upon the ground that plaintiff was *in pari delicto* with defendant corporation and could not recover.

■ From the evidence produced and findings made thereon, it appears that the transaction here involved was not a security within the meaning of the Corporate Securities Law.

In *People* v. *Davenport, supra,* at page 686, it is said that since "the legislature specifically excepted from the operation of the act 'promissory notes', falling within the provisions of section 2(b), subdivisions 10 and 11 . . . it plainly was not the legislative intent that '*every*' note or evidence of indebtedness, regardless of its nature and of the circumstances surrounding its execution should be considered as included within the meaning and purpose of the act." It quotes from 37 Corpus Juris, at page 275, and said: " 'It means the investment of funds *in a designated portion of the assets and capital of a concern, with a view of receiving a profit through the efforts of others than the investor*; and in this sense includes what are termed 'security' or 'investment' contracts or 'speculative securities'. But it does not extend to ordinary commercial contracts, *nor does it include interest income from the lending of money,* or the *profits which one might make by his own efforts* as the result of any ordinary commercial contract.' "

It was held in the Cecil B. De Mille Productions case, *supra,* that the purpose of the Corporate Securities Law was to protect the public, as well as to safeguard individual purchasers and subscribers or creditors, and that an ordinary note, whether secured or unsecured, not offered to the public or sold to an underwriter for resale, is not "security" requiring a permit. In the instant case it appears that the business first contemplated was a joint adventure or partnership, and plaintiffs were to engage in such joint adventure or partnership with defendants. In fact, nearly all planning and business arrangements were done by plaintiffs after the agreements were signed and plaintiffs were to have control over the expenditures of any money by said partnership. It should be here noted that at least $1,201.10, the amount set forth in note No. 1, was advanced prior to the date of the amended memorandum. It might be well believed that these advances were made and that this note was issued under the original memorandum agreement. Under it, the respective interests of the parties in the "tentative oral partnership" were agreed

upon and therein indicated. It recites that plaintiffs "propose investing in said partnership and business" the sum of $6,000, for which they were each to receive a "10 per cent" interest in the "partnership" and that they agreed to invest that sum. Therein it was also agreed that thereafter they would immediately incorporate. By the subsequent agreement, plaintiffs endeavored to attach a condition to the investment of their $6,000 in cash in the partnership, dependent upon the business being incorporated and shares of stock of that value being issued to them. They agreed, however, that pending the incorporation, they would advance portions of it, by way of a loan to defendants, to be represented by the promissory notes indicated. The only time this investment was not to be considered a loan would be if the shares of stock were issued and were transferrable, in which case it was to be considered that the loan was paid.

A similar situation was discussed in *Polizzi* v. *Porcaro*, 110 Cal.App.2d 395 [242 P.2d 949]. There defendant was in a food brokerage business. Plaintiff was in the restaurant business. Defendant and his son wanted to operate a cannery. No such cannery was operated prior to a written agreement subsequently signed by plaintiff and defendant. Plaintiff agreed to invest $12,500 for a one-fourth interest therein and a corporation was to be formed. Plaintiff, as one of the organizers, was to have one-fourth of the capital stock, and defendant was to supervise the work and deliver the certificate of stock covering the $12,500 to plaintiff "as soon as the papers were ready." Plaintiff was privileged within one year to seek a return or a refund of his capital, plus 5 per cent interest. Plaintiff paid the money and defendant used it in the business. Plaintiff never received the stock nor was any such stock issued or authorized for this purpose. An action followed by plaintiff to recover the $12,500, and he contended that the agreement was a corporation stock subscription agreement, and accordingly in violation of the Corporate Securities Act. Judgment in favor of defendant was affirmed on appeal. The court held that where a document providing that for a specific sum of money plaintiff was to have a certain percentage interest in a corporation, of which *he was an organizer*, and could, within a certain time, refuse the stock and terminate the agreement, it was an agreement for a joint adventure in which the adventurer would form a corporation, and not a stock subscription agreement.

In *Sargent* v. *Coppage*, 47 Cal.App.2d 122 [117 P.2d 412],

it was held that an agreement under which the plaintiff is assigned a percentage in a mine with the right to his assignors to form a corporation and to assign to him a percentage interest in the capital stock is not the sale of a security for which a permit is required under the Corporate Securities Act; that the agreement is a temporary expedient only to provide a record of the interests of the parties pending formation of the corporation.

In *Austin* v. *Hallmark Oil Co.*, 21 Cal.2d 718 [134 P.2d 777], it was held that the Corporate Securities Act rendering invalid securities issued without the requisite permit does not apply to an assignment where the assignee is not a *mere investor* but is *to share in the conduct of the enterprise.*

For the purposes indicated, the distinction between a joint adventure and partnership is difficult to define. The memorandum agreement referred to the arrangement as a partnership. The acts actually performed thereunder may have amounted only to a joint adventure. ■ As the two relations are similar, the rights of the joint adventurers, as between themselves, are governed by practically the same rules that govern the relation of partners. (14 Cal.Jur. p. 761, § 2.)

In *Oakley* v. *Rosen* (1946), 76 Cal.App.2d 310 [173 P.2d 55], it was said, quoting from the syllabus:

"While it may be a legal conclusion to differentiate an agreement for joint venture from a contract for a copartnership or a corporate organization, yet it becomes a finding of fact when it distinguishes a contract for a joint venture from a certificate of stock, a bond or other type of security referred to in the Corporate Securities Act." And that "An agreement for a joint venture cannot reasonably be construed as a security within the meaning of the Corporate Securities Act. The facts that no such instrument as the agreement in question was listed as a security in the statute and that it has never been construed as a security, justifies the inference that the Legislature had no intention that it should be so regarded." (Corp. Code § 25100(n).)

"While a contract for a joint venture might be used as a subterfuge whereby to evade the requirements of the Corporate Securities Act, yet such attempted evasion must be found as a fact before the author of the scheme may be subjected to the penalties that flow from such violation. No such evasion was shown here where the agreement was not intended to be a security."

In the instant case no such attempted evasion was found by the trial court to exist, nor is it indicated. The finding was that there was no violation of the Corporate Securities Law. The trial court was justified in so finding.

There is some evidence that the two patents involved were not as represented, or at least were not acceptable, and accordingly, under the terms of the agreement, plaintiffs were not obligated to invest the $6,000, in which case the notes were to be payable when due. There is no direct finding on this issue. Plaintiffs set up the notes in their complaint and alleged that they were due and payable and had not been paid. Defendant's answer denies these allegations, sets up the written memorandum as a complete defense, by which it is claimed defendants were relieved of liability because there was no infringement of patents and thereby no loss resulted to plaintiffs. The court specifically found that the allegations of plaintiffs' complaint were true, and that the allegations of defendant's answer, in this respect, were untrue, but did find that no "opinion of said patent counsel was introduced in evidence" in this respect. In view of the conclusion reached as to the nature of the transaction, it becomes unimportant to determine the effect of the court's finding on this issue.

The last claim is that the notes were part of an invalid and unconsummated agreement and therefore the money invested was voluntarily paid and cannot be recovered. The court found that, as between the parties, the signing of the memoranda agreements gave effect to them to the extent that they were executed and carried out by them and, to that extent were valid and binding. This finding has evidentiary support. In view of this conclusion, and since the court found upon sufficient evidence that the monies advanced by plaintiffs to defendants were individual loans to them and that no violation of the Corporate Securities Law resulted, the contention that the money invested was voluntarily paid is without merit. (*Simon Newman Co.* v. *Fink,* 206 Cal. 143, 146 [273 P. 565].) It cannot be held, as a matter of law, that the contract here involved was illegal and that plaintiffs and defendants were *in pari delicto.* (*Norwood* v. *Judd,* 93 Cal.App.2d 276, 284 [209 P.2d 24]; *Western Oil etc. Co.* v. *Venago Oil Corp.,* 218 Cal. 733, 745 [24 P.2d 971, 88 A.L.R. 1271].)

Judgment and order affirmed.

Barnard, P. J., and Mussell, J., concurred.